Roberta S. Savage (SBN 202940)
221 G Street, Suite 207
Davis, CA 95616
tel (530) 753-4497
fax (530) 753-4498

Attorney for
A.B.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.B., a minor, By and Through W.F.B., His Guardian Ad Litem,<br><br>         Plaintiff,<br><br>v.<br><br>SAN FRANCISCO UNIFIED SCHOOL DISTRICT,<br>         Defendant._____/ | CASE NO.  07-4738 PJH<br><br>PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date:  July 23, 2008<br>Time:  9:00 a.m.<br>Ctrm:  3 |

TABLE OF CONTENTS

I.   Substantial Deference to the ALJ's Decision is Not Warranted . . . . . . . . . . . . . . . . . . . . 1

II.  The ALJ's Determination on the Statute of Limitations is Too Restrictive  . . . . . . . . . . 1

III. The ALJ Improperly Concluded that SFUSD's Pervasive Procedural Errors were Harmless
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  AB Lost Educational Opportunity Due to SFUSD's Violations of the IDEA . . . . . . . . . 5

     A.   AB's Lost Educational Opportunity is Difficult to Quantify Due to SFUSD's Failures
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   AB's Mother Supplemented His Program to Avoid a Loss of Educational
          Opportunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  SFUSD's Failure to Make Clear Written Offers for ESY is Not Salvaged by Mother's Notice
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.   The ALJ Made Factual Mistakes in SFUSD's Favor . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI.  The Cornerstone of the IDEA is Proper Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.   The IDEA Requires Appropriate Assessment in All Areas of Suspected Disability
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.   SFUSD's Failure to Properly Assess Denied AB's Mother Meaningful Participation
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     C.   SFUSD's Present Levels of Performance and Annual Goals Were Flawed . . . . 10

          1.   AB's Annual Goals are Not Measurable Even When Additional Information
               is Considered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

TABLE OF AUTHORITIES

**Cases**

*Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) . . . . . . . . . . . . . . . . 8-10

*Bend-Lapine Sch. District v. K.H.*, 43 Indiv. Disab.Educ. Law. Rptr.  191 (D.C. Ore. 2005)  . . 11

*Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) . . . . . . . . . . . . . . 1

*County of San Diego v. Cal. Spec. Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) . . . 1

*Kirby v. Cabell Cty Bd. Of Educ.,* 46 Indiv. Disab.Educ. Law. Rptr. 156 (S.D. W.Va 2006) . . . 11

*Union v. Smith*, 15 F.3d 1519 (9th Cir. 1994)   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Berry,* 627 F.2d 193 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 66 L. Ed. 2d 843, 101 S. Ct. 925 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Green*, 648 F.2d 587 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Hibler*, 463 F.2d 455 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Statutes**

Cal. Educ. Code § 56320 (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff submits this Reply in Support of Plaintiff's Motion for Summary Judgment. Plaintiff incorporates his Motion for Summary Judgment and his Opposition to Defendant's Motion for Summary Judgment into this pleading to avoid duplication of arguments.

I.   **Substantial Deference to the ALJ's Decision is Not Warranted**

Substantial deference is warranted to administrative decisions when the decision is thorough and well-reasoned. *County of San Diego v. Cal. Spec. Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). Due to the jumbled analysis it is difficult to know how the ALJ reasoned her way to the various determinations of what did or did not constitute FAPE. Substantial deference is not due in AB's case.

The ALJ stretched fact and law to side with SFUSD. Her application of the statute of limitations is without legal support, numerous findings of harmless error is tortured, the failure to find a loss of educational opportunity is inconsistent with the record, and her findings related to the Extended School Year offers of placement, including prior written notice are inconsistent. Moreover, SFUSD concedes, the ALJ's opinion includes at least one material errors. Given the material error and lack of a cohesive analysis, the ALJ's decision is not entitled to substantial deference.

II.  **The ALJ's Determination on the Statute of Limitations is Too Restrictive**

The ALJ, without analysis or citation, found that all procedural violations related to the March 2003 IEP were outside the statute of limitations. [2444¶ 35; 2446 ¶¶ 46, 47.] SFUSD's argument that the date of the March 2003 IEP is the bright-line cut-off for AB's claims is factually flawed. SFUSD now argues that, due to AB's mother's interest in his March 2003 IEP, she should have known to file his claim for a procedural denial of FAPE by March 26, 2006. [SFUSD Opp., pg. 4:8-16.] The argument might make sense if AB's mother had presented her feedback after the IEP, but in AB's case his mother's written input, dated March 24, 2003, came before the March 26, 2003 IEP and before she had reason to know what SFUSD would offer.

1  [2786-90, 3351-65.] Moreover, the argument assumes the fact that any parent would have to
2  consider and know, or have reason to know about the procedural defect on the day of the IEP.
3  This is not always the case. In this case, for example, AB's mother could not know if "funding
4  and staffing permitted" AB to participate in Integrated Play Groups until the school year began.
5  [3364.] A bright line rule based upon the date of the IEP is not appropriate because it presumes
6  an impossibility that every parent will always be able to spot a procedural violation on the face of
7  the IEP.
8        Another demonstration of the flaw in the ALJ's bright line approach is the series of
9  events that occurred in the development of AB's 2005 IEP. That IEP was held in installments
10  from March to May. [3270-318.] If a bright line rule is applied which IEP date would trigger the
11  statute of limitations? If AB filed a hearing request that included the May IEP would he be able
12  to challenge the content of the March IEP or would he be limited to only those components
13  generated at the May IEP? Further, what happens if the IEP is held on March 1st but the written
14  document is not generated and mailed to the family until March 30th and the family does not
15  receive it until April 15th due to an error in the mail. If AB files a hearing request that includes
16  the April 15th date, can he also challenge the IEP that was generated as a result of the March 1st
17  IEP? The use of a bright line rule specifically relating to the date of the IEP, rather than focusing
18  on the operative IEP for the time period covered by the IEP, is a procedurally unfair rule,
19  arbitrarily limiting otherwise legitimate claims for a denial of FAPE.
20        The fairest standard is to permit a student to challenge an IEP that was implemented
21  within the statute of limitations, even if the IEP was drafted outside the statute of limitations.
22  Just as with any other continuing violation, any other result would create an evidentiary
23  nightmare to determine when the IEP was drafted, presented and received by the parent, and the
24  parent had time to consider the written offer. Since the procedural violations are not necessarily
25  cured by time, they continue to exist and the IEP would continue to be flawed until an IEP was
26  held to either change the offer or cure the defect.
27
28

III. **The ALJ Improperly Concluded that SFUSD's Pervasive Procedural Errors were Harmless**

The ALJ found no less than 17 procedural errors committed by SFUSD. [*See* AB's Motion for Summary Judgment, Appendix.] The ALJ, ignoring the whole picture, isolated each individual procedural error and summarily picked off almost half of them as harmless. [*See* AB's Motion for Summary Judgment, Appendix.] These eight "harmless" errors were far from harmless when examined individually, and especially harmful when examined cumulatively. Because of SFUSD's pervasive procedural errors occurring throughout AB's early education, he did not receive appropriate assessments, appropriate goals could not be established for him, his progress could not accurately be measured. [*See* AB's Motion for Summary Judgment, Sections III.C-G & Appendix.] He lost untold educational opportunities that cannot be regained. [*See* AB's Motion for Summary Judgment, Section, III.A.6, pgs. 11-12.] His mother was forced to spend considerable money and time making up for the SFUSD's errors as best she could. [*See* AB's Opp., Section IV, pgs. 9-19.] The totality of SFUSD's errors are not harmless.

SFUSD defends the ALJ's inappropriately dismissive treatment of SFUSD's eight "harmless" procedural errors by asserting that she was somehow *required* to analyze each error in isolation under *Rowley* and its' progeny. [SFUSD's Opp. p.4-5.] *Rowley* states no such requirement of individualized error analysis. *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982) (Stating only that "a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.") The ALJ was simply charged with determining whether SFUSD complied with the IDEA's procedures; *Rowley* does not dictate how she was to make that determination, and certainly does not require each error be evaluated in isolation.

Moreover, the ALJ's approach to harmless errors goes against the case law applying the

doctrine. Courts have been applying the "cumulative effect doctrine" as it relates to harmless errors for decades. It is most often found in the criminal law context, and is used to deal with situations where, as here, several procedural errors add up to a denial of due process:

> In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See United States v. Green*, 648 F.2d 587 (9th Cir. 1981). **Where, as here, there are a number of errors at trial, "a balkanized, issue-by-issue harmless error review" is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant.** *United States v. Wallace,* 848 F.2d 1464, 1476 (9th Cir. 1988). In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors. *United States v. Berry,* 627 F.2d 193 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 66 L. Ed. 2d 843, 101 S. Ct. 925 (1981). "This is simply the logical corollary of the harmless error doctrine which requires us to affirm a conviction if there is overwhelming evidence of guilt." *Id*. at 201; *see also United States v. Hibler*, 463 F.2d 455 (9th Cir. 1972).

*United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (emphasis added). Not only is it permissible to look at the overall effect of SFUSD's procedural errors, it is improper not to. In the criminal context the overall effect of all the small errors can create a big denial of due process. Similarly in the context of the IDEA cumulative errors should create a big denial of FAPE.

   The overall effect of all of the SFUSD's errors, small and large, is very different than the one presented by the ALJ's balkanized harmless error analysis. SFUSD committed procedural errors at every stage of AB's IEP process, from assessment to implementation of goals, in each of the four years addressed in AB's complaint. Particularly harmful are the errors that prevented AB from being properly assessed because, as discussed *infra*, without accurate assessments a FAPE is impossible. Also harmful are the SFUSD errors that required AB's mother to compensate for them through private programs. Yet, these are the primary types of errors that the ALJ improperly found harmless.[*See* AB's Motion for Summary Judgment, Appendix.] The cumulative effects of SFUSD's actions toward AB and his mother were (a) educational programs that were not reasonably calculated to enable AB to receive educational benefits and (b) exclusion of AB's mother from any meaningful participation in the IEP process.

IV. **AB Lost Educational Opportunity Due to SFUSD's Violations of the IDEA**

　　A.　*AB's Lost Educational Opportunity is Difficult to Quantify Due to SFUSD's Failures*

Any difficulty that exists in specifying the loss of educational opportunity to AB is due to SFUSD's failures. AB's rights should not be further infringed upon because SFUSD did not meet its obligations under the IDEA. SFUSD failed to properly assess AB, preventing all parties from having accurate, current information about him across time. SFUSD failed to draft clear, measurable goals with a measurable baseline, this also prevents all parties from knowing how AB progressed or did not from one year to the next.

Just as AB's mother had to seek outside help with AB's education, any useful information regarding his lost educational opportunity comes from outside sources, such as Dr. Nunno and Dr. Guterman. [2869-91, 3425-35.] It follows then, that SFUSD's failures created a dearth of useful evidence to determine whatever or not its failures generated a loss of educational opportunities. SFUSD could not have expected AB's mother to sit by and let her son fail solely for the purpose of proving at a due process hearing that he lost educational opportunity caused by SFUSD's failures. No parent would permit such a result. She filled in the void left by SFUSD with outside programs. His progress is in part attributable to these supplemental services. [3611:3-3617:8, 3624:15-3626:18, 3633:25-3640:5, 3680:12-3682:21, 3683:14-3687:17, 3697:13-3705:25, 3706:18-3719:13; *see also* AB's Opp. Section IV.B. & C.]. That he made progress during the time that his public school education was supplemented demonstrates that these opportunities would have been lost BUT FOR his mother's interventions.

SFUSD also benefitted from her interventions by not spending the money it was obligated to spend on AB for appropriate services. She should be compensated for the services that SFUSD refused to provide. Otherwise, school districts would have incentive to ignore their duties under the IDEA because there is no risk of enforcement and they save money.

B.   *AB's Mother Supplemented His Program to Avoid a Loss of Educational Opportunity*

AB's mother asked for assessments in 2005 because district did not respond to Dr. Nunno's report which resulted in AB's needs remaining unfulfilled. [759:8-21.] She also believed he would not benefit from SFUSD's program without supplemental services and she would not have supplemented his program if they were unnecessary. [889:14-891:2.] She acted with the express purpose of avoiding a loss of educational opportunity.

The most salient example of how AB's mother avoided a loss of educational opportunity is the services she provided to him starting in the 2004 ESY, at the end of his Second Grade Year. Prior to that time, SFUSD recommended that AB enroll in a special day class at Starr King for Third Grade Year. [3341.] AB participated in Quest Therapeutic Camps and therapy with Floria Fung during the 2004 ESY. [2824.] SFUSD provided AB with no interventions that summer. The private services that summer singlehandedly improved AB's behaviors such that SFUSD no longer sought to place him in a special day class. His mother's interventions clearly helped avoid a loss of educational opportunity.

IV.   **SFUSD's Failure to Make Clear Written Offers for ESY is Not Salvaged by Mother's Notice**

SFUSD argues, and the ALJ found, that AB's mother was aware of the ESY offer and rejected it. [SFUSD Opp. pg. 9:1-11.] This argument is, at first blush, supported by the ten-day notices given by AB's mother stating that she "carefully considered" the ESY offers. Yet, AB's mother testified at hearing that she rejected a special day class placement, not a specific program. [131:6-138:13, 191:20- 24; 202:1-203:19, 839:13- 840:15, 901:23-902:14.] Her careful consideration was that a special day class placement, generally speaking, was inappropriate. It does not mean that SFUSD's offer had adequate specificity in its description of the program. AB's mother had no way to consider a specific program because SFUSD failed to provide her sufficient information.

In *Union v. Smith*, *15 F.3d 1519 (9th Cir. 1994)*, the district's offer of a particular class

1 placement was rejected by the Hearing Officer because there was no clear written offer of
2 placement. *Union Sch. Dist. v. Smith*, 15 F.3d. 1519 (9th Cir. 1994). The specific purpose of
3 making the clear written offer of placement was to alert the family of the program to consider and
4 in order for the parties to put on evidence of the programs in case of a due process hearing. *Id*.
5 AB's Third Grade inclusion teacher, Ms. Emling's inability to articulate what SFUSD's 2005
6 ESY offer was, is exactly why a clear written offer of placement is necessary. [1169:7-1170:23.]
7 AB's mother was unable to reject a specific offer of placement because a clear one was not made.
8 Even the ALJ mentioned, on the record, that the 2004 ESY offer was a "general" one. [142:1-
9 11.] Moreover, SFUSD's concession that the ALJ incorrectly found that Starr King was the 2004
10 ESY placement is further support for why a clear written offer of placement was missing and was
11 necessary. [SFUSD Opp. 8:23-9:1.] If the ALJ misunderstood the placement offer, how could it
12 be clear?

13       AB's mother knew that she disagreed generally with a special day class for AB during the
14 ESY. It is unfair to extend that to say, as the ALJ did, that she understood the details of the offer
15 of placement. If one of AB's teacher was unaware of the program components how would it
16 have been possible for his mother to be knowledgeable about the components enough to
17 understand the offer. [1169:7-1170:23.] AB's mother never testified that she understood the
18 ESY offers other than to state that she knew it was a special day class.[1] The type of special day
19 class, or any specific detail of the particular class for AB was not available for her to consider.

20       SFUSD failed to make a clear written offer of placement for the relevant ESYs.

21 **V.**    **The ALJ Made Factual Mistakes in SFUSD's Favor**

22       The ALJ made various factual mistakes that were material to her analysis. SFUSD
23 concedes one of the ALJ's factual errors, but then argues that the error is meaningless. The ALJ
24 wrongly found that Starr King was the placement offered for the 2004 ESY. [SFUSD's Opp.

---

[1] Ms. Sodhi's testimony highlights the fact that SFUSD does have different types of special day classes, as she references the class at Starr King as an "autism-specific special day class" as well as the fact that one school site could have multiple special day classes, as she notes that Starr King has three special day classes on site. [1266:18-1268:18.]

8:23-9:11.] The ALJ used this incorrect finding to conclude that SFUSD had made a clear offer that was understood by AB's mother. If the ALJ was unclear what the offer was, how was it possible that AB's mother knew the offer?

The ALJ found that Dr. Pamela Mills, SFUSD's Director and Program Administrator "translated Dr. Nunno's clinical medical evaluation into educational information." [2398-99 ¶39.] This finding is not supported by the record. Dr. Mills testified that she did not recall seeing Dr. Nunno's evaluation prior to preparing for the hearing. [1937:23 -1938:6.] Yet the ALJ used this fact to determine that SFUSD had considered Dr. Nunno's May 2004 assessment, thereby negating the need for the agreed upon psycho-educational assessment in 2005, or the need to reimburse AB's mother for Dr. Guterman's June 2005 assessment. [2398 ¶ 39-2399¶ 42, 2435 ¶ 209.] Again, the ALJ's errors form the basis of her denial of relief to AB.

VI. **The Cornerstone of the IDEA is Proper Assessment**

A.  *The IDEA Requires Appropriate Assessment in All Areas of Suspected Disability*

Assessment is the first step in determining eligibility for special education, as well as, determining a disabled student's unique educational needs. A school district is required to assess each disabled child in all areas of suspected disability. Cal. Educ. Code § 56320 (f). AB's autism impacts his behavior, communication, sensory motor development, social skills development and his processing of information. [2888-91, 3431-35.] SFUSD was required to assess AB in these areas as these were areas of suspected disability. The failure to properly assess AB's behavior since Second Grade, standing alone or when paired with the later failures to properly assess his speech-language and communication needs and his sensory motor needs is a denial of FAPE. Without the critical baseline information to determine what exactly all of AB's unique educational needs were, it is not possible for SFUSD to have developed an appropriate program.

B.  *SFUSD's Failure to Properly Assess Denied AB's Mother Meaningful Participation*

SFUSD argues that AB's case is distinguished from *Amanda J.* because all parties knew that AB was autistic and knew that he had behavioral issues. [SFUSD Opp. pg. 12-13.] This is a

distinction without significance. The underlying meaning of *Amanda J.* is that parents are uniquely knowledgeable about their autistic child, parents are important IEP team members, and that school districts must share relevant information with parents that would have an impact on the child's program or how that parent would act. *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). All of these elements exist in AB's situation, consistent with *Amanda J.*

SFUSD admitted that AB's mother provided them with substantial information about AB and his unique educational needs. No one disputed that his mother was uniquely knowledgeable about him or the services in the San Francisco Bay Area.[2]

AB's mother was an IEP team member in form alone. SFUSD claims that many, not all, of her requests were incorporated and implemented by staff. [SFUSD Opp. pg. 6.] AB does not dispute that SFUSD implemented minor changes to AB's program based upon information provided by his mother, such as putting up posters his mother provided. [851:7-15.] The dispute is that on major issues, SFUSD did not consider the input provided by AB's mother at all. Specifically, the IEPs from 2004 on do not reflect Dr. Nunno's May 2004 recommendations for daily speech therapy or weekly occupational therapy. [*Compare* 3434-35 *with* 3246-69, 3270-318, 3319-43.] No IEP team meeting was held after AB's mother requested one in the Fall 2004. [169:15-185:12 (AB's mother testimony regarding multiple communications with SFUSD staff where she received no response)] Updated speech and language goals and objectives were not presented after AB's mother failed to consent in 2005, nor was there any response to her March 23, 2005 letter regarding her thoughts to the IEP. [190:19 - 191:12 (AB's mother's testimony about no response to her letter).] Kim Long did not respond to AB's mother October 4, 2005 email describing supplemental therapies and asking questions about AB's program. [760:14-762:11 (mother's testimony about no response from Ms. Long), 2892.] An improper behavioral assessment was conducted in the Fall 2005 that was untimely. [2411 ¶ 93.] SFUSD failed to even

---

[2] Dominique Baudry testified that AB's mother was uniquely knowledgeable about the services available in the San Francisco region for AB. [3746:25-3747:8.]

1  conduct an agreed upon psycho-educational assessment in the Fall 2005. [2399 ¶ 42.] Even if it
2  were true that some requests made by AB's mother were incorporated into his program, SFUSD
3  refused to acknowledge AB's mother's most fundamental requests that demanded a response.
4  This refusal should rise to the level of denial of FAPE because those requests sought had the
5  potential to make significant changes to AB's program which would have reduced the amount of
6  supplemental services necessary for him to make progress.

7  Finally, SFUSD's distinction between the school district in *Amanda J.* failing to give
8  information to a parent and SFUSD failing to create that information in the first place is artificial.
9  In either scenario, the district failed to meet its IDEA obligation to provide accurate current
10 information of the child to his parent, which prevents the IEP team from developing a proper
11 IEP. The bottom line is that SFUSD failed to properly assess AB's behavioral, speech and
12 language/communication, sensory motor needs and needs that would have been covered in a
13 psycho-educational assessment. The failure to do so, prevented SFUSD from giving AB's
14 mother accurate information about him which denies her meaningful participation in the
15 development of his IEP, just as it did in *Amanda J*. The effect of the harm may never be known.

16  C.  *SFUSD's Present Levels of Performance and Annual Goals Were Flawed*

17  SFUSD argues that instead of looking at the required components of AB's annual goals,
18 that the Court should look at the IEP in aggregate to determine that his annual goals were
19 measurable. [SFUSD's Opp., pg. 17-21.] Whether the Court looks at the annual goals separately
20 or in the aggregate, the same conclusion should be reached. Namely, there was insufficient
21 information to create measurable annual goals.

22  1.  AB's Annual Goals are Not Measurable Even When Additional
23      Information is Considered

24  The ALJ found that the goals were measurable when looking at the IEP as a whole. [2413
25 ¶ 102- 2418 ¶124.] In its Opposition papers, SFUSD includes further information about the
26 present levels of performance for AB's 2004, 2005 and 2006 annual goals. [SFUSD's Opp., pg.
27 17-20.] The difficult part in reviewing the goals is piecing all the information together to see if
28

sufficient information exists to clearly identify AB's present level of performance in order to create measurable annual goals. *Kirby v. Cabell Cty Bd. Of Educ.,* 46 Indiv. Disab.Educ. Law. Rptr. 156 (S.D. W.Va 2006); *Bend-Lapine Sch. District v. K.H.*, 43 Indiv. Disab.Educ. Law. Rptr. 191 (D.C. Ore. 2005). In AB's case, when the information is all pieced together, there still is no clear present level of performance from which appropriate annual goals can be built.

The problem with the SFUSD goals is illustrated by some of the 2004 goals discussed in its Opposition papers, specifically "Work Skills" and "Social Interactions" goals.

| **Independent Work Skills [3330]** | | |
|---|---|---|
| *Present Level of Performance* | *Annual Goal* | *Objective*[3] |
| 20-25% of work completed daily | Given classroom assignments with visual supports and clear structure and directions [AB] will complete assignments with adult monitoring 4 out of 5 assignments | Given classwork assignments with visual supports and clear structure and directions [AB] will begin work within 5 minutes of adult cue, 4 out of 5 times |
| **Social Interaction [3332]** | | |
| *Present Level of Performance* | *Annual Goal* | *Objective* |
| difficulty interacting with peers  **Specific baseline with Objective**: does not tell peers to stop pushing/taunting, difficulty joining in play | Given outdoor and indoor play opportunities [AB] will use socially and age-appropriate behaviors to interact with peers 4/5 opportunities by observation with fading adult facilitation | Given a conflict with a peer [AB] will use words to express his needs (e.g. "Stop that" "I want a turn" "I want to play") "I want you to..." with fading adult facilitation 4/5 opportunities |

The goals above fail to show a connection between the skill defined in the present level of performance and either the annual goal or objective. For example, the Independent Work Skills goals does not state how long it takes AB to start a task at the time the goal was written, yet the objective is that he will begin within 5 minutes. Without specific information about how long it takes him to start an activity after he receives an adult cue, no one can know that starting in 5 minutes will be an improvement.[4] He may already start within 5 minutes. Without a clear

---

[3] Plaintiff acknowledges that these goals have 3 objectives each, but will only focus on the first goal to illustrate the point.

[4] This specific information is not available in any other part of the IEP. [3319-43.]

A.B. v. San Francisco Unified School District, C 07-4738
Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment
Page 11 of 13

1    measurable present level of performance how could his IEP team, including his mother, know
2    that the goal was met in one year and if it was, was that improvement from the prior year.

3          Additionally, the present level of performance does not indicate whether AB completes
4    the 20-25% of the work with adult facilitation or independently.[5] The present level is silent on
5    that fact, yet the goal and objective both introduce adult cues or monitoring.  Without knowing
6    what AB can do independently versus with adult cueing/monitoring, including what level of
7    monitoring or cues are currently required, how can his progress be measured.  It may be that AB
8    completed 75-80 % of his work with adult cues and 20-25% independently at the time the present
9    level of performance was written.  That would mean that the goal of having him complete 4 out
10   of 5, or 80% of his work with adult monitoring was already met at the time the goal was written
11   making the goal inappropriate.

12         The Social Interaction goal is similarly flawed.[6]  In that case, the goal and objective have
13   two different present levels of performance.  Although both are to be determined at 4 out of 5
14   opportunities, how will anyone know that the adult facilitation is faded and that the fading is an
15   improvement without knowing what level of adult facilitation is required, at the time the goal
16   was written.  The goal and objective do not define what adult facilitation is, could it be that an
17   adult facilitates the dispute between AB and a peer, could it be that an adult makes the statements
18   that AB cannot, or could it be that an adult tells AB what statement to use and then has AB make
19   the statement to his peer.  Also, without a measurable and clear present level of performance it is
20   not clear that the goal is reasonable.  If AB's current skills are not near "age-appropriate" then
21   writing a goal that he will do something at an "age-appropriate" level is not reasonable.  The goal
22   is unclear, and as such, is not measurable.

23         The problem with SFUSD's failure to develop clear measurable goals was compounded
24   by the fact that the IEP team that developed the 2003 IEP goals did not implement them, nor did

---

[5] This specific information is not available in any other part of the IEP. [3319-43.]

[6] The narrative section SFUSD pointed out fails to include any detailed information about AB's peer interactions except to note that "progress towards the above goals was limited by frequent absences and refusals to work." [3328]

the team from 2004 or 2005.[7]  This makes a clear statement of AB's present level of performance critical.  The team that wrote the Social Interaction goal may have facilitated AB with his peers in one way while the team that implemented that same goal the next year may have provided a different type of facilitation which may have been more restrictive.  Without clear statements of AB's present levels of performance that track AB's goals and objectives, no one will know what progress or lack of progress AB made.

VII.    **Conclusion**

Based upon all papers filed in support of Plaintiff's Motion for Summary Judgment, Plaintiff respectfully requests that his motion be granted and SFUSD's motion be denied.

                Respectfully Submitted,

                ROBERTA S. SAVAGE

                Attorney for Plaintiff A.B.

Dated: June 18, 2008       By: _____
                 Roberta S. Savage

---

[7] A review of the IEPs developed for AB across time show that the 2003, 2004, and 2005 IEPs were developed by different teams. [3246-69, 3270-318, 3319-43.]