# Exhibit 1

107 LRP 53516

### Board of Education of the Chatham Central School District

### New York State Educational Agency

07-076

### August 16, 2007

**Judge / Administrative Officer**

Paul F. Kelly, State Review Officer

## Full Text
## Appearances:

### APPEARANCES

Julie Michaels Keegan, Esq., attorney for petitioners

Young, Sommer, Ward, Ritzenberg, Baker & Moore, LLC, attorney for respondent, Kenneth S. Ritzenberg, Esq., of counsel

DECISION

Petitioners appeal from that part of the decision of an impartial hearing officer which denied their request to be reimbursed for the cost of private special education teacher services that they obtained for their son for the 2006-07 school year. Respondent cross-appeals from the impartial hearing officer's determination that it failed to offer an appropriate educational program to petitioners' son and that the private special education teacher services obtained by petitioners for their son were appropriate. The appeal must be dismissed. The cross-appeal must be dismissed.

When the impartial hearing began in December 2006, the student was 13 years old and in the seventh grade at the Robert C. Parker School (Parker) where he also received consultant teacher services from a private special education teacher hired by his parents (Tr. pp. 80, 645). Parker is a small, private regular education school for children in preschool through eighth grade

pp. 29, 318). > The student has high verbal cognitive abilities, but insufficient active working memory

and significant weaknesses in processing speed (Joint Ex. 1 at pp. 11, 14). He also has significant weaknesses in math, weaknesses in writing, spelling and organization (Joint Exs. 1 at pp. 11-12, 14, 16; 3 at pp. 1-4, 13, 19-21; 5 at pp. 1, 2; 31 at p. 1) and demonstrates anxiety related to his academic skills (Tr. p. 41; Joint Exs. 1 at p. 15, 16, 23; 3 at pp. 2, 3; 5 at p. 2). In

addition, he exhibits weaknesses in motor development and is somewhat tactilely defensive and "gravitationally insecure" (Joint Ex. 2 at p. 3). The student's classification and eligibility for special education programs and services as a student with a learning disability are not in dispute (8 NYCRR 200.1[zz][6]).

The student has attended Parker since kindergarten (Tr. p. 32). In February 2005, when the student was in the fifth grade, petitioners arranged for him to be evaluated by a private educational consultant (Joint Ex. 1). The evaluation took place over four days in February, March and April, and the evaluator prepared a report dated April 25, 2005 (id.). Administration of the Weschler Intelligence Scale for Children - Fourth Edition (WISC-IV) yielded a General Ability Index of 114, indicating that the student's general intelligence was in the high average range (id. at p. 10). The private evaluator reported that the student's working memory index score indicated difficulty with skills needed for reading and that his performance on working memory subtests indicated difficulties with working memory for mathematics (id. at p. 11). The private evaluator also reported that the student showed significant weakness in the area of processing speed (id.). She noted that the student appeared to have difficulties in visual scanning abilities, cognitive flexibility, and sequential processing ability, and that anxiety impacted his ability to process in a timely fashion (id.). The private evaluator further reported that the student's scores on the Weschler Individual Achievement Test - Second Edition (WIAT-II) were indicative of "learning disabilities in reading, mathematics and written language" (id. at p. 12). Additional test results

indicated that the student had visual perceptual difficulties (id. at p. 13). The private evaluator concluded that the student had specific learning disabilities in reading, written expression and spelling (id. at p. 16). Noting that the student had difficulty with abstract concepts of time; mental math; understanding and remembering math concepts, rules, formulas, and order of operations; and basic addition, subtraction, multiplication, and division facts, the private evaluator concluded that the student exhibited behaviors associated with dyscalculia1 because of his difficulties with active working memory (id.). She indicated that the student was in emotional distress regarding his academic performance and was experiencing anxiety in the clinical range (id.). The private evaluator recommended that the student be referred to the Committee on Special Education (CSE); that he receive various accommodations and that certain evaluations be conducted including a speech-language evaluation, a sensory integration evaluation and an assistive technology evaluation (id. at pp. 17-19). She also recommended numerous strategies to assist in developing the student's written expression, and to help improve his mathematical performance, active working memory and organization and study skills (id. at pp. 20-23). In addition, she recommended individual counseling to address the student's anxiety (id. at p. 23).

After receiving the April 2005 psychoeducational evaluation report, petitioners referred their son to the CSE (Joint Ex. 8) and hired a tutor for two hours per week to help their son in math (Tr. p. 56). By letter dated May 11, 2005 to petitioners, the CSE Chairperson explained the evaluation process and indicated that their consent was required for the evaluations (Joint Ex. 6).

1 In her report, the private psychologist indicated that in order to be "classified with dyscalculia" a child must have intellectual functioning that falls within or above normal range and a significant discrepancy between his age and math skills (Joint Ex. at p. 16).

2

In a response dated June 6, 2005, the student's

mother submitted the consent form and a social history, and advised the CSE Chairperson that she had scheduled a speech and language evaluation for her son for mid-August (Joint Ex. 7). Petitioners asked the CSE to wait until the private evaluations had been completed before it conducted its own evaluations (Tr. pp. 126, 581, 725).

In a July 2005 private occupational therapy evaluation report, the occupational therapist indicated that the student had a significant motor delay which was impacting his academic ability (Joint Ex. 2 at p. 3). She noted that she did not complete gross motor testing as the student became embarrassed because he could not complete certain skills (id. at p. 2). She also identified some sensory concerns and indicated that the student's motor and sensory processing difficulties could be increasing his anxiety (id.). The occupational therapist recommended that the student receive occupational therapy in his educational setting (id.).

The student was seen for a private speech-language evaluation on August 24, 2005 (Joint Ex. 3). On formal language diagnostics, the student displayed average receptive and expressive vocabulary and above average listening comprehension and oral expression (id. at p. 1). The speech-language pathologist indicated that overall the student's reading skills fell within the average to above average range (id.). On a contrived writing measure, the student scored within the low end of the average range exhibiting basic vocabulary choices, weak sentence formulation and written output that did not match the sophistication of his oral language skills (id. at pp. 18-19). The speech-language pathologist reported that the student scored very low on a test measuring punctuation, capitalization and spelling (id. at pp. 1, 19). She also indicated that the student exhibited weaknesses with handwriting and overall legibility (id. at pp. 18-19). The speech-language pathologist recommended referral to the CSE to determine eligibility for special education services specifically for the writing process, higher level reading/fluency and spelling, and to review the need for occupational therapy services (id.). She

recommended various strategies and resources to assist the student with the writing process (id. at pp. 5-6). She also recommended classroom accommodations and strategies to improve and increase the student's independent reading, vocabulary, and spelling, and recommended counseling to foster development of strategies and coping techniques to manage anxiety relating to learning style (id. at pp. 7-9).

The student continued to attend Parker for sixth grade during the 2005-06 school year (Tr. p. 32). Results of an auditory processing evaluation of the student conducted in September 2005 supported age-appropriate auditory processing skills (Joint Ex. 4 at p. 2). The evaluator reported that the student's performance on the Phonemic Synthesis test was slightly below age norms, which he indicated may impact the student's reading skills (id.).

By letter dated December 6, 2005, petitioners advised the CSE Chairperson that the private testing of their son was completed and they requested a CSE meeting (Joint Ex. 13). They enclosed copies of the April 2005 psychoeducational evaluation report, the July 2005 occupational therapy evaluation report, the August 2005 speech-language evaluation report and the September 2005 auditory processing evaluation report (id.).

3

In a January 2006 follow-up evaluation, respondent's school psychologist indicated that he investigated the student's weaknesses in reading, writing and mathematics (Joint Ex. 5 at p. 1). The school psychologist reported that the student demonstrated adequate word attack skills, fair fluency, and a well-developed reading vocabulary (id.). He indicated that prior assessments found that the student had age appropriate reading comprehension and that further investigation of the student's reading skills was unnecessary (id.). The school psychologist reported that the student's writing skills were weak, but that they were in a "broad range that is manageable by a regular education teacher" (id.). The school psychologist further reported that the

student's mathematics skills were well below those of his same age classmates (id.). He found evidence of learning disabilities in mathematics, writing and spelling and indicated that the student required intensive instruction in mathematics, but that writing and spelling difficulties could be addressed with supplementary support and assistance within the regular education program (id. at p. 2).

The CSE met on February 8, 2006 (Joint Exs. 16; 19). The day before the CSE meeting, petitioners prepared a description of their son's "learning issues" and requested that it be part of the record of the meeting and considered by the CSE (Joint Ex. 18). At the meeting, the CSE noted that the student demonstrated weak academic skills in mathematics, spelling and writing (Joint Ex. 16). It determined that the student be classified as having a learning disability and recommended that he receive consultant teacher services at Parker (Joint Ex. 19 at p. 6). The individualized education program (IEP) developed as a result of the meeting included a writing goal and a math goal (id. at p. 5).

In a letter dated February 28, 2006, petitioners requested that their son's February 2006 IEP be revised to include additional test scores, a statement regarding the nature of the student's processing speed being characterized as a "High-Priority Concern," and additional modifications and accommodations (Joint Ex. 24).

The student began receiving consultant teacher services at Parker at the end of March or early April 2006 (Tr. p. 66). The CSE met on June 7, 2006 for the student's annual review and to develop his IEP for the 2006-07 school year (Joint Ex. 33). Prior to the CSE meeting, petitioners received a phone call from respondent informing them that, due to a change in state law respondent, as a matter of policy, would no longer be providing consultant teacher services to students at private schools (Tr. pp. 71, 255-56, 271-72, 310). Petitioners subsequently confirmed this change in policy in another phone conversation with respondent (Tr. pp. 256, 271), and sent an email to respondent confirming that their son would not be

Copyright # 2007 LRP Publications

receiving consultant services at Parker for the 2006-07 school year (Tr. pp. 256-57; Parent Ex. B). At the beginning of the June 7, 2006 CSE meeting petitioners inquired again about whether their son would receive services at Parker for the 2006-07 school year and were informed that services would not be provided to the student at Parker (Tr. pp. 73, 133, 272-73, 274-75, 310). The CSE determined that the student should continue to be classified as having a learning disability and recommended that he be placed in a general education class and receive math instruction in a special class at respondent's middle school five times per week for 40 minutes (id.). The IEP included an annual goal for mathematics and an annual goal for improving study skills and organizational strategies (id.). Petitioners did not object to the recommendations (Tr. p. 300). In addition to discussing special education services, the CSE discussed providing the student an opportunity to attend a

4

summer remedial math class (Tr. pp. 73-74, 78-79). After visiting the program, petitioners declined the summer services (Tr. pp 134-35).

By letter dated August 25, 2006, petitioners requested an impartial hearing asserting, among other things, that the June 2006 IEP failed to address the student's needs in relation to all areas of his disability; that the goals lacked any objective baseline to measure progress; and that the recommended service was inappropriate (IHO Ex. 1). Petitioners asserted that such deficiencies constituted a denial of a free appropriate public education (FAPE)2 (id.). Petitioners requested that various services, including consultant teacher services, be provided at Parker; that an assistive technology evaluation be conducted; and that accommodations and modifications be provided to the student for testing, homework and class work (id.). On September 11, 2006, respondent answered petitioners' allegations and asserted that the proposed IEP afforded the student the FAPE "to which he is entitled" (IHO Ex. 2).

In September 2006, petitioners privately

contracted with a special education teacher to provide consultant teacher services to their son at Parker for five to six hours per week for the 2006-07 school year (Tr. p. 645; IHO Ex. 3, Motion To Amend Hearing Request at p. 2).

In mid-October, petitioners filed a motion to amend their due process complaint notice to include a claim for reimbursement for the cost of the private special education teacher they had obtained for their son for the 2006-07 school year (IHO Ex. 3, Motion To Amend Hearing Request at p. 2). Petitioners also requested that the impartial hearing officer order respondent to provide direct and indirect consultant teacher services to their son during the pendency of the proceeding (id.). Respondent filed an answer which included a motion to dismiss petitioners' motion to amend and petitioners' claims made under Education Law # 3602-c (IHO Ex. 3, Answer To Motion To Amend Hearing Request at p. 2). By decision dated October 30, 2006, the impartial hearing officer granted petitioners' motion to amend their due process complaint notice to include a claim seeking reimbursement for the services of the private special education teacher and denied respondent's motion to dismiss (IHO Ex. 3, Pendency Decision & Order at p. 4). In addition, the impartial hearing officer ordered respondent to continue to provide services to the student as provided on his February 8, 2006 IEP, specifically, direct consultant teacher services twice weekly for 60 minutes and indirect consultant teacher services once weekly for 30 minutes at Parker (id.).

The impartial hearing began on December 4, 2006 and concluded on February 8, 2007, after four days of testimony. The impartial hearing officer rendered her decision on May 18,

2 The term "free appropriate public education" means special education and related services that -

(A)

have been provided at public expense, under public supervision and direction, and without charge;

(B)

meet the standards of the State educational agency;

(C)

include an appropriate preschool, elementary, or secondary school education in the State involved; and

(D)

are provided in conformity with the individualized education program required under section 1414(d) of this

title.

20 U.S.C. # 1401[9].

5

2007.3    She found that the program recommended by the CSE was inadequate to meet the range of the student's special education needs, that the CSE failed to consider the continuum of services effectively denying petitioners a meaningful opportunity to participate in the development of an IEP for their son; that writing goals which had been included on the student's February 2006 IEP were eliminated without discussion; and that no services or explanation were provided with respect to how to address the newly developed organizational goals (IHO Decision at p. 22). Accordingly, she found that respondent failed to offer the student a FAPE for the 2006-07 school year (id.). The impartial hearing officer further found that petitioners had demonstrated the appropriateness of the private special education teacher services that they obtained for their son at Parker (IHO Decision at p. 23). However, the impartial hearing officer determined that petitioners' failure to comply with regulatory requirements of the IDEA to provide notice to respondent of their intent to unilaterally provide private services for their son and seek reimbursement from respondent supported a denial of their request for reimbursement for the 2006-07 school year based on equitable considerations (IHO Decision at p. 27).

Petitioners appeal from the impartial hearing officer's findings and determination that equitable considerations did not support their claim for reimbursement for the services they obtained for their son for the 2006-07 school year. Respondent cross-appeals from the impartial hearing officer's determination that it did not offer the student a FAPE and that petitioners provided their son with appropriate services. In addition, respondent requests that the impartial hearing officer's pendency determination ordering it to deliver services at Parker be annulled.

The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer v. Weast, 126 S. Ct. 528, 536-37 [2005] [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]). Petitioners seek reimbursement for the cost of private special education teacher services they obtained for their son for the 2006-07 school year. A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a

3 In its answer, respondent raises an affirmative defense that petitioners failed to file the petition in a

---

Copyright # 2007 LRP Publications

timely manner. It asserts that the impartial hearing officer's decision was "mailed to petitioners on March 22, 2007" and that the petition was not filed until July 1, 2007. However, the impartial hearing officer's decision is dated May 18, 2007. I find that the appeal is timely.

6

Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

In its cross-appeal, respondent asserts that the impartial hearing officer erred in finding that the program recommended for the student for the 2006-07 school year was inadequate to meet the range of his special education needs. The hearing record shows that the student was initially classified at a CSE meeting in February 2006 (Joint Ex. 19). The IEP developed as a result of that meeting indicated that the student's writing skills were weak and that in-class support was considered but determined to be inadequate to meet the student's writing support needs across content areas (id. at pp. 3, 7). The February 2006 IEP included a goal related to the student's writing needs and provided for direct consultant teacher services, outside the general education setting, to address those needs (id. at p. 6). The consultant teacher began providing services to the student in late March or early April 2006 and had provided services for approximately two months before the CSE met in June 2006 to develop the student's program for the 2006-07 school year (Tr. p. 66; Joint Ex. 29).

At the June 2006 meeting, the CSE reviewed the consultant teacher's June 2006 report (Tr. p. 164). In his report, the consultant teacher indicated that he worked with the student on understanding and implementing the process of writing; which included brainstorming, outlining, draft writing and editing (Joint Ex. 29). He noted that the student benefited from examples of writing tasks and needed assistance to follow the writing process (id.). The consultant teacher further noted that the student was making progress in writing and that the student needed to continue to work on writing skills (id.). The June

2006 CSE also reviewed reports from the student's teachers at Parker who noted that the student had made some progress since the consultant teacher began working with him and indicated that there still was a "strong need" for help with organizing ideas for essays, spelling and sentence structure (Joint Ex. 30). The CSE further reviewed a 2005-06 year end progress report from the student's math teacher at Parker who indicated that the student continued to struggle to work independently, but benefited from working with a tutor after school and was able to complete almost all of the work that was covered (Parent Ex. A at p. 1). A report from the student's language arts teacher indicated that the student needed to work on grammar, sentence structure and spelling, as well as organizational skills (id. at p. 2). The student's social studies teacher indicated that the student struggled with written communication of ideas and his thoughts often were less developed than when they were spoken (id. at p. 5). He indicated that he would work with the student during the 2006-07 school year on organizing his thoughts before he writes responses (id.).

The IEP developed as a result of the June 2006 CSE meeting also identifies the student's weak writing skills (Joint Ex. 33 at p. 3). However, unlike the February 2006 IEP, the June 2006 IEP does not contain any writing goals (id. at p. 5). The CSE chairperson testified that discussions at the June 2006 CSE meeting indicated that the student's writing needs could be addressed in the general education setting (Tr. p. 161). However, the record shows that the June 2006 CSE considered much of the same written information that the February 2006 CSE considered four months earlier when it recommended consultant teacher services (Tr. p. 164). The new information considered by the June 2006 CSE included the consultant teacher's report and notes from the student's teachers at Parker, and that information supported a continuation of services to address the student's writing deficits (Joint Exs. 29; 30). The record shows that the

7

**Special Ed Connection Case Report**

student was making progress with the services of a consultant teacher and the teachers who worked most closely with the student identified continuing needs in the area of writing (Joint Exs. 29; 30). I agree with the impartial hearing officer that when the CSE met in June 2006 it should have considered recommending consultant teacher services to address the student's writing deficits and that the June 2006 IEP failed to appropriately address those needs.

In addition to having weaknesses in writing, the student exhibited weaknesses in math (Joint Ex. 1 at pp. 14, 16). The February 2006 IEP indicated that the student's math skills were substantially below age level expectations and that the student required math instruction at a different level than his current class (Joint Ex. 19 at p. 3). The February 2006 IEP provided for consultant teacher services to address the student's math needs (id. at p. 6). However, as noted above, the consultant teacher primarily addressed the student's needs as they related to writing and requesting assistance from teachers, and assistance in math was provided by a private tutor after school (Tr. pp. 253, 780-81; Joint Ex. 29).

As noted above, the CSE reviewed the consultant teacher's report at the June 2006 meeting when it met to recommend a program for the student for the 2006-07 school year (Tr. p. 164). The report indicated that the student spent a lot of time working on math skills and had difficulty trying to keep up with both the pace of the class and the workload (id.). The report further indicated that the student was progressing on his math goal and that he continued to require additional assistance and focus on his basic computation skills (id.). It noted that the student received math assistance after school from another teacher whose main focus was completing homework (id.). The June 2006 CSE also considered the report from the student's teachers at Parker which indicated that the student required 1:1 help with math skills (Joint Ex. 30).

The IEP developed as a result of the June 2006 CSE meeting identifies the same weaknesses regarding the student's math skills that were identified

at the February 2006 CSE meeting (Joint Ex. 33 at p. 3). However, the June 2006 IEP provides for a special class to address the student's math needs rather than consultant teacher services as provided for in the February 2006 IEP (id. at p. 6). The CSE Chairperson testified that at the June 2006 CSE meeting the CSE discussed that consultant teacher services were not sufficiently intense to address the student's math needs (Tr. pp. 166, 173). However, as noted above, the CSE chairperson also testified that the CSE did not have information that indicated a change in the level of need from January 2006 to June 2006 (Tr. p. 785). The record shows that the student was making progress in math with the services of a consultant teacher and the teachers who worked most closely with the student identified continuing needs (Joint Exs. 29; 30). I agree with the impartial hearing officer that when the CSE met in June 2006 it should have considered recommending consultant teacher services to address the student's math deficits.

The impartial hearing officer also found that the June 2006 IEP failed to recommend services to address the student's organizational needs (IHO decision at p. 20). The student's June 2006 IEP indicates that the student has an ongoing need to improve organizational skills (Joint Ex. 33 at p. 3). It contains a goal indicating that the student would demonstrate an improvement in his study skills and organizational strategies with a focus on utilizing his assignment notebook, asking his classroom teachers for clarification, increasing his time management skills

8

and implementing strategies for reading textbooks (id. at p. 5). However, there are no services listed on the June 2006 IEP to address that goal (id. at p. 6). Respondent claims that the student's organizational needs would be addressed by the special education teacher in the student's special class for math (Tr. pp. 161, 791-94). I am not persuaded by respondent's argument. The June 2006 IEP does not indicate how the organizational goal will be addressed given that the only service listed on the June 2006 IEP

Copyright # 2007 LRP Publications

is a special class for math for 40 minutes per day (id. at p. 6), and there is no explanation given for how the student's math teacher would work on the organizational and study skills listed in the goal during the self-contained math class.

In addition, I agree with the impartial hearing officer's finding that the June 2006 CSE's failure to consider consultant teacher services denied petitioners the opportunity to effectively participate in the development of an appropriate IEP for their son. As noted above, at the beginning of the June 2006 CSE meeting, petitioners inquired about whether services for the 2006-07 school year would be provided at Parker and were informed that they would not be (Tr. pp. 73, 133, 272-73, 274-75, 310). Other witnesses present at the June 2006 CSE meeting corroborated petitioners' testimony (Tr. pp. 332-33, 336, 587-88). The student's father testified that consultant teacher services were ruled out at the beginning of the meeting and there was no further discussion about the availability of such services (Tr. pp. 274-75). Based on the foregoing, I agree with the impartial hearing officer that respondent failed to offer an appropriate program to the student for the 2006-07 school year and that petitioners have prevailed with respect to the first criterion for an award of reimbursement.

With respect to the second criterion for an award of reimbursement, petitioners must show that the services they obtained for their son were appropriate to meet his special education needs for the 2006-07 school year (Burlington, 471 U.S. 359; Frank G. v. Bd. of Educ., 459 F.3d 356, 363 [2d Cir. 2006]). In order to meet that burden, the parent must show that the services provided were "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., that "the private education services obtained by the parents were appropriate to the child's needs" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119 at 129; see also Frank G., 459 F.3d at 363; Cerra, 427 F.3d at 192). Parents are not held as strictly to the standard of placement in the least restrictive environment (LRE) as school districts are; however, the restrictiveness of the parental placement may be considered in determining whether the parents are entitled to an award of tuition reimbursement (Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21 [1st Cir. 2002]; M.S. v. Bd. of Educ., 231 F.3d at 105).

As noted above, the student has weaknesses in math, writing and organization (Joint Exs. 1 at pp. 14, 16; 31 at p. 12). To address those weaknesses petitioners hired a private special education teacher in September 2006 (Tr. p. 645). The private special education teacher hired by petitioners was a certified special education teacher with more than 30 years of experience teaching in a public school (Tr. pp. 643, 645). She taught both self-contained and inclusion classes at the seventh grade level (Tr. pp. 643-44).

The private special education teacher testified that she met with the student at Parker on Mondays and Wednesdays for approximately two hours during which time she worked with the student independently on his math and any other courses with which he needed help (Tr. pp. 645-46, 657-59, 686). The sessions included providing the student with assistance related to

9

organizational skills, completing assignments and preparing for tests (Tr. pp. 646, 657-59, 686). On Tuesday and Thursday afternoons she "pushed into" the student's math class and worked with the student in a small group within the classroom where she supported the student on the math curriculum (Tr. pp. 646, 654).

The private special education teacher testified that, with respect to math, her role was to support the student in his regular seventh grade math class; to modify the curriculum to meet the student's needs; and to assist the student in mastering concepts and becoming more independent in math (Tr. pp. 650-51). She indicated that Parker employed a connected math curriculum (Tr. pp. 646-47), which she described as a reading based text and noted that the student was a very good reader (Tr. p. 670). She further indicated that she was familiar with the curriculum and had

used it during the last eight years of her public school teaching (Tr. p. 647).

I note that the private special education teacher reported that the student had mastered his IEP goal related to math with 80 percent accuracy working independently and demonstrated 90 percent mastery when provided with prompts (Tr. p. 664). She testified that the student was growing in confidence, that he was more willing to take risks in math, and that she had seen progress (Tr. pp. 662-63). The teacher opined that the student required math support in the regular education classroom because he understood the concepts being taught and had good critical thinking skills but he was delayed in his ability to do math calculations (Tr. pp. 669-70).

In addition to providing math assistance to the student outside of the classroom, the private special education teacher provided assistance to the student outside of the classroom in other subjects (Tr. p. 658). With respect to writing, the private special education teacher testified that ideas and concepts were an area of strength, but that his mechanics were weak and he needed help with grammar, spelling and punctuation (Tr. pp. 659-60). She also testified that she helped the student edit his written work (Tr. p. 660). She stated that while she had seen improvement, the student continued to require help with capitalization, punctuation and editing independently (Tr. p. 669).

With respect to organizational skills, the private special education teacher testified that she conferred with the student's teachers weekly to determine the areas in which he needed extra help (Tr. p. 658). She further testified that she helped the student meet deadlines, complete unfinished assignments, study for tests, and organize his work and notebook (Tr. pp. 658-59). She stated that the student required help with organization at the end of the school day (Tr. p. 659) and continued to require support with organizational study skills (Tr. p. 667). The private special education teacher testified that the student continued to need support with the tasks identified in the study skills and organizational goal (Tr. pp. 667-68).

The private special education teacher also provided 30 minutes per week of indirect consultant teacher services during which she met with the student's teachers, retrieved assignments and discussed his progress (Tr. p. 708). Based upon the information before me, I find that the consultant teacher services provided at Parker were appropriate to meet the student's special education needs and that the student received educational benefit from such services (Joint Exs. 29; 30). Accordingly, I find that petitioners have prevailed with respect to the second criterion for an award of reimbursement.

10

I now turn to whether petitioners' claim is supported by equitable considerations, the third criterion for an award of reimbursement. The impartial hearing officer found that the failure of petitioners to comply with state and federal notice requirements regarding their intent to unilaterally provide private services to their son and seek reimbursement from respondent supported a denial of their request. She found that petitioners first provided notice to respondent that they were seeking reimbursement in mid-October when they moved to amend their due process complaint notice (IHO Decision at p. 25). She noted that despite having hired the private special education teacher in September 2006, petitioners did not advise respondent until October 2006 (id.). Petitioners argue that the notice requirements do not apply to services and that respondent had both notice and an opportunity to address its concerns. They assert that their August 2006 due process complaint notice indicated that they disagreed with the June 2006 IEP, and their proposed resolution included 1:1 math instruction and consultant teacher services, the same services they contracted with the private special education teacher to provide. I am not persuaded by petitioners' arguments. The record shows that petitioners did not object to the CSE's recommendation at the June 2006 meeting (IHO Decision at pp. 25-26). In fact, they first provided notice to respondent of their disagreement with the IEP in August 25, 2006 as part of their request for an impartial hearing (Tr. pp.

768-769; IHO Decision at pp. 25-26). In addition, petitioners did not provide notice to respondent that they intended to seek reimbursement for private educational expenses until the month after the private special education teacher was hired. Under the circumstances, I agree with the impartial hearing officer that the equities do not support petitioners' claim.

Finally, I address respondent's contention that the impartial hearing officer erred in ordering pendency services at Parker. A student must remain in his or her then current educational placement, unless the student's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the student (20 U.S.C. # 1415[j]; 34 C.F.R. # 300.518; Educ. Law # 4404[4]). Pendency has the effect of an automatic injunction, which is imposed without regard to such factors as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Drinker v. Colonial Sch. Dist., 78 F.3d 859 [3d Cir. 1996]; Zvi D. v. Ambach, 694 F.2d 904 [2d Cir. 1982]; Wagner v. Bd. of Educ., 335 F.3d 297 [4th Cir. 2003]). The purpose of the pendency provision is to provide stability and consistency in the education of a student with a disability and strip schools of the unilateral authority they had traditionally employed to exclude students with disabilities from school (Honig v. Doe, 484 U.S. 305, 323 [1987]). It does not mean that a student must remain in a particular site or location (Concerned Parents and Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751 [2d Cir. 1980]; Application of the Bd. of Educ., Appeal No. 99-90), or at a particular grade level (Application of a Child with a Disability, Appeal No. 95-16).

Under the IDEA, the pendency inquiry focuses on identifying the student's then current educational placement (Zvi D., 694 F.2d at 906). Although not defined by statute, the phrase "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced (Murphy v. Bd. of Educ., 86 F. Supp. 2d 354, 359 [S.D.N.Y. 2000] aff'd, 297 F.3d 195 [2002]; Application of a Child with a Disability, Appeal No. 01-013; Application of the Bd. of Educ., Appeal No. 00-073). It may or may not turn out to

11

be the same placement that is determined to be the appropriate educational placement for the child after the conclusion of a hearing on the merits of the recommended program for that year. The U.S. Department of Education has opined that a child's then current placement would "generally be taken to mean current special education and related services provided in accordance with a child's most recent [IEP]" (Letter to Baugh, 211 IDELR 481 [OSEP 1987]; see Susquenita Sch. Dist. v. Raelee, 96 F.3d 78, 83 [3d Cir. 1996]; Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625 [6th Cir. 1990]; Drinker, 78 F.3d at 867 [last functioning IEP]; Gregory K. v. Longview Sch. Dist., 811 F.2d 1307 [9th Cir. 1987]).

The impartial hearing officer ordered respondent to provide direct and indirect consultant teacher services at Parker as provided in the student's February 2006 IEP, the last agreed upon IEP. I find no reason to disturb the impartial hearing officer's order.

THE APPEAL IS DISMISSED.

THE CROSS-APPEAL IS DISMISSED.

**103 LRP 21179**

**Birmingham School District**

**Michigan State Educational Agency**

SEH 2001-003

**March 15, 2001**

**Judge / Administrative Officer**

Sharon T. LaPointe, Hearing Officer

**Full Text**

**Appearances:**

**Memorandum, Opinion and Order**

**Introduction**

Before the Hearing Officer is Respondent [ ] Public Schools' Motion to Dismiss and supporting Brief. Petitioners have filed a Response to [ ] Public Schools' Motion to Dismiss. Hereafter Respondent will be referred to as "District" and Petitioners will be referred to as "Parents".

Summary dismissal is appropriate when no genuine issue of material fact remains to. be decided and the moving party is entitled to judgment as a matter of law, *Lakeman v. Mead Containers,* 779 F. 2d 1146 (6th Cir. 1986); Fed. R. Civ. P. 56(c). In applying this standard, the Hearing Officer reviews all materials offered in support of the motion for summary dismissal, as well as all pleadings and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby,* 106 S Ct 2505, 2510 (1986). In deciding such a motion the Hearing Officer must consider "whether the evidence presents sufficient disagreement to require an evidentiary hearing or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

**I. Facts**

1. [ ] eligible for special education under the Individuals with Disabilities Education Act (IDEA) and Michigan Mandatory Special Education Act (MMSEA) [ ] was found eligible as an emotionally impaired (El) student in an IEP dated May 15,1998. Are-evaluation was conducted in the Spring of 2000,

resulting in the April 7, 2000, MET recommendation for continuing EI eligibility.

2. An IEP Team meeting held on June 5,2000, determined that [ ] continued to be eligible for special education as an emotionally impaired student pursuant to Michigan Revised Administrative Rule 340.170d(b)(c)(d). *See* Attachment A, Respondent's Brief in Support of Motion to Dismiss.

3. The Parents assert that at the June 5, 2000 IEP they requested, and the District agreed to provide as part of [ ]'s IEP, certain psychological, psychiatric, medical and/or physical evaluations. [ ]'s private psychologist, Dr. Jeffrey Last, attended the June 5, 2000 IEP.

4. Page five (5) of the June 5,2000 IEP contains a section entitled "Supplementary Aids and Services". This section contains no reference to psychological, psychiatric, medical and/or physical evaluations.

5. Page 6 of the June 5, 2000 IEP contains a section entitled "Student's Program and Ancillary Services." This section contains no reference to psychological, psychiatric, medical and/or physical evaluations.

6. No other sections of the June 5, 2000 IEP contain any reference to a need for, or commitment to conduct, the above-described evaluations.

7. The Parents assert a prior history (i.e pre June 5, 2000) of the District omitting relevant information from the IEP or entering mis-statements of fact in the IEP.

8. Despite the fact that the IEP contained no reference to the need for, or commitment to, the above-described evaluations, the Parents signed the IEP in agreement. *See* Attachment A to Respondent's Brief in Support of Motion to Dismiss.

9. The Parents subsequently took [ ] to the Mayo Clinic in Rochester, Minnesota, where he received the above described evaluations between July 31 and August 4, 2000.

10. On September 25, 2000, the Parents sent a letter to the District enclosing documentation

prepared by the evaluators at the Mayo Clinic, a statement for Mayo Clinic charges of $2,546.98, and travel and lodging expenses to and from the Mayo Clinic in the amount of $1,602.35. At that time, the Parents requested reimbursement of $1,602.35, asserting that Mayo Clinic evaluations were medical services for diagnostic or evaluation purposes, and thus reimbursable as IDEA "related services". *See* Exhibit 4, Petitioners' Brief.

11. On October 24, 2000, the Parents sought additional reimbursement for the Mayo Clinic evaluations as a result of limitations in the family's insurance coverage. The claimed reimbursement in the October 24, 2000, letter totaled $3,730.14.

12. Neither the September 25 nor the October 24 letter requested that an IEP Team meeting be held to consider the results of the medical evaluations vis-a-vis [ ]'s IEP programs and services.

13. On October 24,2000, the Parents requested a due process hearing for the purpose of determining their right to reimbursement for costs related to [ ]'s "mental health" evaluation at the Mayo Clinic in July/August 2000.

14. On November 7, 2000, the District declined to pay reimbursement, citing the Parents to state and federal rules regarding independent educational evaluations at public expense. The District noted that the right to an IEE at public expense was contingent on a parental statement of disagreement with the evaluations obtained by the District, which the District asserted had not occurred to that point in time.

15. On November 14, 2000, the Parents filed a complaint on the basis of the District's alleged failure to timely respond to the due process hearing request.

16. On January 3, 2001, the Michigan Department of Education ordered the District to proceed to hearing, which led to the instant proceedings.

## II. Discussion

The Parents assert and the Hearing Officer will assume for purposes of this motion, that during the June 5, 2000 IEP, they requested the inclusion of further evaluations, specifically a psychiatric/psychological evaluation, (including related medical/laboratory tests) as a component of the programs and services to be provided by [ ]'s June 5, 2000 IEP. The Parents further assert that the District verbally assented to these evaluations. In this regard however, the Hearing Officer is constrained by the four corners of the IEP document itself. *See Knable v. Bexley City School District.* 34 IDELR #1 (6th Cir. 2001) where the Sixth Circuit held:

We must limit the evaluation of the [district's] proposed IEP to the terms of the document itself as presented in writing to the [parents]. The IDEA specifically requires school districts to provide parents a formal written offer before either initiating a placement for the disabled child or otherwise providing a FAPE to the child. *See* 20 USC # l415(b)(I)(C). In discussing the importance of the formal written offer requirement, the Ninth Circuit has noted that the requirement is not merely technical, but rather serves the important purpose of creating a clear record of the educational placement and other services offered to the parents. *See Union School District v Smith.* 15 F. 3d 1519, 1526 (9th Cir. 1994). The written offer not only helps to eliminate factual disputes between the school district and parents about proposed placements, but also "greatly assists parents in presenting complaints with respect to any matter relating to the ... educational placement of the child." *Id.* The written offer requirement should therefore be enforced rigorously. *Id.*"

Given the Parent's assertion of the District's prior history of omitting relevant information in the IEP, and the Sixth Circuit's determination that a written offer requirement set forth in the IEP document itself should be rigorously enforced, the Parents' agreement [ ]'s June 5,2000 IEP constituted an assent to the proposed FAPE, which did not include evaluations for which they currently seek reimbursement. Accordingly, the Parents have merely exercised the rights of any parents to procure private services at

private expense.

The Parents appear to assert that if the related service of evaluation is necessary for FAPE, they should be reimbursed irrespective of notice to the District, or the involvement of the IEP Team. Reviewing federal courts are increasingly protective of the integrity of the IEP process as outlined in IDEA. *See Hines v. Tullahoma City School System.* 28 IDELR 456 (6th Cir. 1998). An example of the significance of the IEP deliberative process is the IDEA private school reimbursement language, which states that reimbursement of parent costs for private school placements may be reduced or denied if the parents do not provide notice to the district either at the most recent IEP meeting or ten (10) business days prior to removal of the child from public school, that the parents are rejecting the placement proposed by the district, their concerns with the district's proposed IEP, and their intent to procure private programming. *See* 20 USC #14l2(a)(10)(C)(iii).

Assuming arguendo, that this matter should be treated as a related service issue versus a publicly funded independent educational evaluation, this Hearing Officer concludes that the IDEA private school reimbursement language is instructive with regard to parental obligations when they are seeking reimbursement of other privately obtained services. Accordingly, to seek reimbursement, the Parents should have given notice of their disagreement with the IEP lacking reference to the requested evaluations, either at the time of the IEP itself or ten (10) business days prior to obtaining the private "related service" evaluations. The Parents provided no notice of disagreement with the District's proposed IEP as they signed the document in agreement. The Parents provided no notice to the District hi between the June 5, 2000 IEP and the July 31 , 2000 evaluation at the Mayo Clinic, which would have allowed the District to convene an IEP to determine whether the evaluations for which reimbursement is sought were required to provide FAPE to [ ]. The evaluations were thus incurred at private expense.

## Decision and Order

On the basis of the foregoing facts, discussion, and conclusions of law, the decision and older of this hearing officer is as follows:

1. The District's motion to dismiss is granted with prejudice based upon the reasons and authorities set forth above.

2. The pending hearing is hereby terminated.

3. Oakland Schools is charged with the responsibility to ensure that this decision has been implemented and so notify the Michigan Department of Education.